United States Court of Appeals
Fifth Circuit

**F I L E D**

September 22, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

No. 03-41260

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**FELIPE de JESUS DOMINGUEZ-OCHOA,**

**Defendant-Appellant.**

**Appeal from the United States District Court**
**for the Southern District of Texas**

Before BARKSDALE and PICKERING, Circuit Judges, and LYNN, District Judge[*].

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue is whether, for Sentencing Guidelines purposes, criminally negligent homicide under Texas law is equivalent to manslaughter and, therefore, an enumerated crime of violence under Guidelines § 2L1.2, permitting the 16-level enhancement imposed against Felipe de Jesus Dominguez-Ochoa. *See* U.S.S.G. § 2L1.2 cmt. n.1(B)(ii)(II) (2002). Criminally negligent homicide has a *mens rea* of negligence; generic, contemporary manslaughter, of recklessness. Therefore, the two offenses are not

---

[*] District Judge of the Northern District of Texas, sitting by designation.

equivalent.  The enhancement is **VACATED**; the case is **REMANDED** for resentencing.

## I.

After a criminal information charged Dominguez with murder, the State moved to reduce the charge.  He pleaded guilty in April 2002 to criminally negligent homicide and was sentenced to 14 months' imprisonment.  Dominguez (a Mexican citizen) was released in November 2002 and deported to Mexico in January 2003.

Within a few days, he was found by Border Patrol Agents near Alamo, Texas.  Dominguez pleaded guilty to being found in the United States after deportation without having obtained the consent of the Attorney General to reapply for admission.  8 U.S.C. §§ 1326(a) and (b).

The presentence investigation report (PSR) recommended a 16-level enhancement under U.S.S.G. § 2L1.2(b)(1)(A)(ii), taking the position that Dominguez' deportation had followed a  conviction for a crime of violence — the criminally negligent homicide to which he had pleaded guilty.  Dominguez objected to the enhancement, claiming that offense was not a crime of violence.  The district court overruled the objection and sentenced Dominguez, *inter alia*, to 57 months' imprisonment.

## II.

In addition to contesting the enhancement, Dominguez claims the "felony" and "aggravated felony" provisions of 8 U.S.C. §§

2

1326(b)(1) and (b)(2) are unconstitutional but acknowledges the issue is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998). The issue is raised only to preserve it for possible review by the Supreme Court.

Accordingly, the remaining issue to address concerns the enhancement. For that issue, the district court's guidelines interpretation is reviewed *de novo*; its factual findings, only for clear error. *E.g., United States v. Washington*, 340 F.3d 222, 231 (5th Cir.), *cert. denied*, 124 S. Ct. 942 (2003).

Section 2L1.2's commentary defines a "crime of violence" in two ways (subparts I and II). It

> (I) means an offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another; and
>
> (II) includes murder, *manslaughter*, kidnapping, aggravated assault, forcible sex offenses (including sexual abuse of a minor), robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling.

U.S.S.G. § 2L1.2 cmt. n.1(B)(ii)(I) and (II) (emphasis added).

Texas criminally negligent homicide occurs when a person "causes the death of an individual by criminal negligence". TEX. PEN. CODE § 19.05. "Criminal negligence" is defined by statute.

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct *when he ought to be aware* of a substantial and unjustifiable risk that the circumstances exist or the result

3

> will occur.  The risk must be of such a nature and degree that *the failure to perceive it* constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PEN. CODE § 6.03(d) (emphasis added).

Dominguez contends Texas criminally negligent homicide is not a § 2L1.2 crime of violence.  He maintains:  concerning subpart (I), and as he urged in district court, it does not include as an element the intentional "use, attempted use, or threatened use" of force; and, concerning subpart (II), it is not one of the enumerated offenses.

The district court appears to have considered the underlying facts of Dominguez' criminally negligent homicide conviction in concluding that the offense was a crime of violence under subpart (I).  Several months after Dominguez was sentenced, however, our court decided ***United States v. Vargus-Duran***, 356 F.3d 598 (5th Cir. 2004) (*en banc*) (use of force required for 16-level enhancement under subpart (I) must be intentional).  In the light of that decision, the Government does not claim criminally negligent homicide is a crime of violence under subpart (I).

Instead, it claims the enhancement was proper under subpart (II):  Texas criminally negligent homicide is equivalent to the enumerated crime of "manslaughter".  *See* U.S.S.G. § 2L1.2 cmt. n.1(B)(ii)(II).  Our court may uphold the district court's ruling on any basis presented in district court and established by the

4

record.  *See, e.g.,* **United States v. Flores**, 135 F.3d 1000, 1002 (5th Cir.) (may affirm on any ground urged in district court), *cert. denied*, 525 U.S. 1091 (1998).  Although the Government did not specifically contend at sentencing that criminally negligent homicide was a crime of violence under subpart (II), the PSR recommended the 16-level enhancement because "Dominguez was convicted of criminally negligent homicide, a crime of violence, pursuant to Commentary Application Note (B)(ii)(I) *and (II)*". (Emphasis added.)

According to the Government, although "criminally negligent homicide" is not one of subpart (II)'s enumerated crimes of violence, the offense is the equivalent of the enumerated offense of manslaughter.  Relying principally on **Taylor v. United States**, 495 U.S. 575 (1990) (holding "burglary" within the meaning of the sentence enhancement statute refers to any crime, regardless of its exact definition or label, having the basic elements of generic, contemporary burglary), the Government maintains the elements of Texas criminally negligent homicide are included in those of manslaughter.

The parties agree on several points:  manslaughter in subpart (II) includes both *voluntary* and *involuntary* manslaughter; only the elements of *involuntary manslaughter* are relevant for this analysis, because *voluntary manslaughter* and criminally negligent homicide require different levels of intent; all formulations of

5

involuntary manslaughter and Texas criminally negligent homicide share the element of one person's causing the death of another; and, therefore, at issue are the proper *mens rea* for involuntary manslaughter and whether it is the same as that for criminally negligent homicide. Essentially, the Government claims involuntary manslaughter includes both a "reckless" and "criminally negligent" *mens rea*; Dominguez, that "recklessness" is the only relevant manslaughter *mens rea* for this enhancement analysis.

The Texas Penal Code defines *manslaughter* as "recklessly" causing the death of another, TEX. PEN. CODE § 19.04; on the other hand, as stated, criminally negligent homicide is defined as causing the death of another "by criminal negligence" ("ought to be aware"), TEX. PEN. CODE § 19.05. For our equivalence analysis, however, **Taylor** precludes use of the specific definition of manslaughter applied by the state of conviction. **Taylor**, 495 U.S. at 590-91.

Relying on **Taylor**, the Government describes at length the common law history of manslaughter and its inclusion of various forms of *mens rea*, including criminal negligence. *See United States v. Browner*, 889 F.2d 549, 551-53 (1989)(same). As **Taylor** demonstrates with respect to burglary, however, the common law is not the source for defining the enumerated offense of manslaughter for this sentence enhancement analysis.

6

> The problem with [looking to the common law] is that the contemporary understanding of "burglary" has diverged a long way from its commonlaw roots.... The arcane distinctions embedded in the common-law definition have little relevance to modern law enforcement concerns.... In the absence of any specific indication that Congress meant to incorporate the common-law meaning of burglary, we shall not read into the statute a definition of "burglary" so obviously ill suited to its purposes.

*Taylor*, 495 U.S. at 593-94; *see* **Browner**, 889 F.2d at 551-53.

**Taylor** instructs that where, as here, the enhancement provision does not specifically define the enumerated offense, we must define it according to its "generic, contemporary meaning", 495 U.S. at 598, and should rely on a uniform definition, regardless of the "labels employed by the various States' criminal codes", *id*. at 592. After observing that the enhancement statute did not define burglary, **Taylor** looked to other sources of authority (the Model Penal Code and W. LaFave & A. Scott, SUBSTANTIVE CRIMINAL LAW (1986)) in order to determine its generic meaning.

### A.

As discussed, § 2L1.1 does *not* define manslaughter (or involuntary manslaughter). Likewise, elsewhere in the guidelines, § 2A1.4, entitled "Involuntary Manslaughter", does not define the offense. Section 2A1.4 concerns, *inter alia*, the federal crime of manslaughter, 18 U.S.C. § 1112, discussed *infra*, *when it is involuntary*, as defined in § 1112. Although § 2A1.4 does *not*

7

define involuntary manslaughter, it does provide different base offense levels for different types of *mens rea*:  10, if the conduct was "criminally negligent"; 14, if it was "reckless".  U.S.S.G. § 2A1.4(a)(1) and (2) (emphasis omitted).  The Government claims this implies that, *for enhancement purposes* under § 2L1.1, the Sentencing Commission considered criminal negligence a sufficient *mens rea* for an involuntary manslaughter conviction.

Indeed, consistent with § 2A1.4's different base offense levels for criminally negligent and reckless conduct, that section's commentary defines criminally negligent conduct as involving "a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, *but which is not reckless*".  U.S.S.G. § 2A1.4 cmt. 2 (emphasis added).  This is similar to the Texas definition of criminal negligence:  when a person "*ought to be aware* ... of a substantial and unjustifiable risk", which "must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint".  TEX. PEN. CODE § 6.03(d) (emphasis added).

We reject this transfer of § 2A1.4 to § 2L1.2 for enhancement purposes under subpart (II).  The guidelines' "principal purpose" is to "establish sentencing policies and practices for the federal criminal justice system".  U.S.S.G. Ch.1 Pt.A n.1.  Toward that

8

end, the Sentencing Commission "drafted the initial guidelines with considerable caution[, after] examin[ing] the many hundreds of criminal statutes in the United States Code". U.S.S.G. Ch.1 Pt.A n.5. The guidelines' base offense levels for various offenses reflect the requirements of those federal statutes, *see, e.g.,* 18 U.S.C. § 1112 and 10 U.S.C. § 919(b), discussed *infra*, as well as many state offenses that come into play for sentence enhancements; they are not an attempt to define a *generic* offense or to provide, *per se*, an implied definition for cross-reference to other guidelines' sections. Rather, the Sentencing Commission attempted to be responsive to the federal and state offenses and provide, *inter alia*, offense levels appropriate for diverse federal and state offenses. As discussed *infra*, a minority of States employ a criminally negligent *mens rea* for involuntary manslaughter; a larger number, one of recklessness.

Although Guidelines § 2A1.4(a)(1) provides a base offense level of 10 if conduct causing involuntary manslaughter was "criminally negligent", and is consistent with the minority form of the offense in some States, the purpose of this guidelines section is to provide base offense levels for *federal* offenses against the person, not to define those offenses. Indeed, none of the various offenses against the person are defined by § 2A1, but all are provided a base offense level. *See* U.S.S.G. §§ 2A1.1 (43 for first degree murder); 2A1.2 (33 for second degree murder); 2A1.3 (25 for

9

voluntary manslaughter); 2A1.4 (involuntary manslaughter:  10 for criminally negligent conduct; 14 for reckless conduct).  Again, none of these offenses is defined.

Obviously, the Sentencing Commission is aware of involuntary manslaughter.  Had it desired to do so, it would have incorporated § 2A1.4 for the enumerated manslaughter offense in subpart (II).  Under these circumstances, cross-referencing guidelines sections does not provide the answer.  *See* **United States v. Sarmiento-Funes**, 374 F.3d 336 (5th Cir. 2004).  In **Sarmiento**, the Government claimed "sexual assault" under Missouri law was a crime of violence, asserting it was equivalent to subpart (II)'s enumerated offense of "forcible sex offenses".  The Government noted that the commentary to Guidelines § 2A3.1 ("Criminal Sexual Abuse") states:  "Sexual offenses addressed in this section are crimes of violence".  U.S.S.G. § 2A3.1 cmt. bkgrd. (emphasis omitted).  **Id**. at 343.  When that guideline was promulgated in 1987, there was only one definition of crime of violence, provided in § 4B1.2; the 1987 commentary to that section stated its definition of crime of violence encompassed, *inter alia*, "forcible sex offenses".  **Id**.  The Government maintained that sexual abuse crimes (such as sexual assault under Missouri law) must be forcible sex offenses and, therefore, crimes of violence.  **Id**.  **Sarmiento** rejected this syllogism:

> The government's argument on this score is logically faulty.  From the propositions (1)

10

> that certain "sexual abuse crimes" are "crimes of violence," and (2) that "forcible sex offenses" are also "crimes of violence," it does not follow that the specified "sexual abuse crimes" are "forcible sex offenses."

*Sarmiento*, 374 F.3d at 343-44.

Similarly, as noted, § 2A1.4 does not define the offense of involuntary manslaughter; rather, it provides alternative base offense levels that vary according to different *mens rea* requirements. This is merely an acknowledgment of different *mens rea* requirements in, *inter alia*, the federal manslaughter statute, 18 U.S.C. § 1112. But simply because § 2A1.4 includes criminal negligence as a *mens rea* for federal involuntary manslaughter, it does not follow that, for enhancement purposes concerning a state offense, subpart (II)'s enumerated offense of manslaughter must also include a negligence *mens rea*.

### B.

Because the guidelines do not define manslaughter (or involuntary manslaughter) for subpart (II) purposes, we must examine other authorities to determine its generic, contemporary definition. *Taylor*, 495 U.S. at 598-99. These authorities demonstrate the requisite generic, contemporary definition utilizes a reckless, but not criminally negligent, *mens rea*.

For involuntary manslaughter, the Model Penal Code requires consciousness of risk:

11

> *Under the Model Penal Code, liability for manslaughter cannot be premised on negligence.* Statutes derived from the common law classify unintentional homicide as involuntary manslaughter without any attempt to distinguish conscious disregard of homicidal risk from inadvertent risk creation. This failure to differentiate across a broad spectrum of culpability raises serious grading difficulties. On the one hand, involuntary manslaughter may be graded as its voluntary counterpart, in which case disproportionately severe sanctions are assigned to conduct that is merely negligent. On the other hand, reduced penalties may be authorized for involuntary manslaughter, in which case persons guilty of serious wrongdoing benefit from formal categorization with less culpable homicides. *Section 210.3(1)(a) refines the traditional definition of manslaughter by demanding proof of conscious disregard of perceived homicidal risk.... Negligent homicide is relegated to a separate provision carrying lesser sanctions.*

MODEL PENAL CODE § 210.3 cmt. 4 at 53 (emphasis added). The Model Penal Code defines *recklessness* as a person having *conscious disregard* for a substantial risk, § 2.02(2)(c); criminal negligence, as when a person "*should be aware* of a substantial and unjustifiable risk", § 2.02(2)(d) (emphasis added).

Discussing the offense of criminal negligence, LaFave states: "The Model Penal Code ... sets forth definitions for the terms 'recklessness' and 'negligence', and in most recent recodifications [of state criminal negligence offenses] the Model Penal Code approach has been substantially followed". 1 W. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.4(b) 372-73 (2d ed. 2003). "The modern view, evidenced by the position taken in most of the recent comprehensive

12

criminal codes, is to require for involuntary manslaughter a *consciousness of risk* — i.e., 'recklessness,' as does the Model Penal Code."  2 LᴀFᴀᴠᴇ, § 15.4(a) 523 (emphasis added).

Two federal manslaughter statutes fail to provide a precise definition for the requisite *mens rea*.  Under the earlier-cited 18 U.S.C. § 1112 (voluntary and involuntary manslaughter), *involuntary* manslaughter is defined as "the unlawful killing of a human being without malice", either "[i]n the commission of an unlawful act not amounting to a felony, or", *inter alia*, in the commission of a lawful act but "without due caution and circumspection".  18 U.S.C. § 1112(a).  This has been interpreted as adopting the common law approach.  **Browner**, 889 F.2d at 551-53.  The offender's mental state is "not sufficiently culpable to meet the traditional malice requirements [for murder]"; instead,

> the requisite mental state is reduced to "gross" or "criminal" negligence, a culpability that is far more serious than ordinary tort negligence but still falls short of that most extreme recklessness and wantonness required for "depraved heart" malice.

*Id*. at 53.  For federal involuntary manslaughter, therefore, a jury must find the defendant

> (1) act[ed] with gross negligence, *meaning a wanton or reckless disregard for human life*, and (2) [had] knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another.

13

*Id*. (emphasis added) (quoting ***United States v. Fesler***, 781 F.2d 384, 393 (5th Cir.), *cert. denied*, 476 U.S. 1118 (1986)).

The Uniform Code of Military Justice provides that killing another by "culpable negligence" constitutes involuntary manslaughter. 10 U.S.C. § 919(b). Such negligence is an "act or omission accompanied by a culpable disregard for [its] foreseeable consequences". Manual for Courts-Martial, United States, p. IV-65, ¶ 44.c(2)(a)(i)(2002) (Appendix A). A defendant need not be subjectively aware of the risk posed by his conduct in order to be guilty of involuntary manslaughter under the statute. *See* ***United States v. Oxendine***, 55 M.J. 323, 326 (2001) (quoting ***United States v. Brown***, 22 M.J. 448, 450 (C.M.A. 1986) (accused need not "be aware of the substantial risk he is creating, but only that a reasonable person would have realized the risk")).

At least 24 state statutes follow the Model Penal Code's definitions of recklessness and negligence. *See, e.g.,* ALA. CODE § 13A-2-2; ALASKA STAT. § 11.81.900; ARIZ. REV. STAT. ANN. § 13-105; ARK. CODE ANN. § 5-2-202; COLO. REV. STAT. ANN. § 18-1-501. And at least 20 state criminal codes require a consciousness of risk, or recklessness, for involuntary manslaughter. 2 LAFAVE, § 15.4(a) 523 n.18; *see, e.g.,* ALA. CODE § 13A-6-3; ALASKA STAT. § 11.41.120; ARIZ. REV. STAT. ANN. § 13-1103; ARK. CODE ANN. § 5-10-104; COLO. REV. STAT. ANN. § 18-3-104. Fourteen States have codes with a single manslaughter statute requiring recklessness. *See, e.g.,* ALA. CODE

14

§ 13A-6-3; ALASKA STAT. § 11.41.120; ARIZ. REV. STAT. ANN. § 13-1103; ARK. CODE ANN. § 5-10-104; COLO. REV. STAT. § 18-3-104(1)(a). Nineteen States have criminal codes with a separate criminally negligent homicide statute requiring negligence. *See, e.g.,* ALA. CODE § 13A-6-4; ALASKA STAT. § 11.41.130; ARIZ. REV. STAT. ANN. § 13-1102; ARK. CODE ANN. § 5-10-105; COLO. REV. STAT. ANN. § 18-3-105. On the other hand, approximately 13 state criminal codes "provide no clear definition of the standard or else utilize a standard which at least appears to be somewhat different than that in the Model Penal Code". 2 LAFAVE, § 15.4(a) 523; *see, e.g.,* CAL. PENAL CODE § 192 ("without due caution and circumspection"); MINN. STAT. ANN. § 609.205 ("culpable negligence", under which it is sufficient that reasonable person would recognize strong probability of injury); MISS. CODE ANN. § 97-3-47 ("culpable negligence"); PA. CONS. STAT. ANN. tit. 18 § 2504 ("reckless or gross negligence").

The Government cites case law from nine States supporting an involuntary manslaughter *mens rea* lower than conscious disregard of substantial risk, or recklessness. *See, e.g.,* **State v. Bennett**, 658 A.2d 1058, 1064 (Me. 1995) (permitting conviction for *failure to be aware of risk* rises to gross deviation from standard); **People v. Jackson**, 364 N.W. 2d 310, 311 (Mich. Ct. App. 1985) (gross negligence does not require defendant be personally aware of danger; danger need only be "apparent to the ordinary mind"); **State v. Guilliot**, 22 P.3d 1266, 1272-73 & n.5 (Wash. Ct. App. 2001) (for

15

second-degree manslaughter, criminally negligent defendant need not be subjectively aware of risk).

Although some state codes incorporate common law definitions of manslaughter, and a small minority of States have embraced a possible criminal negligence *mens rea* for involuntary manslaughter, the modern trend defines involuntary manslaughter as involving recklessness. Accordingly, we hold that generic, contemporary manslaughter (including involuntary manslaughter) requires a recklessness *mens rea*. Therefore, because criminally negligent homicide under Texas law does not employ the recklessness *mens rea* necessary for generic manslaughter, it is *not* its equivalent and is *not* the subpart (II) enumerated manslaughter crime of violence.

## III.

For the foregoing reasons, Dominguez' conviction is **AFFIRMED**; his sentence is **VACATED**; and this case is **REMANDED** for resentencing.

*AFFIRMED IN PART; VACATED IN PART; REMANDED*

16

CHARLES W. PICKERING, SR., dissenting.

The majority correctly states that the issue in this case is whether for "Sentencing Guidelines purposes, criminally negligent homicide under Texas law is equivalent to manslaughter and, therefore, an enumerated crime of violence under Guidelines § 2L1.2." Because I am persuaded that criminally negligent homicide under Texas law is equivalent to manslaughter as set forth in Guidelines § 2L1.2, I respectfully dissent.

The majority concludes that *Taylor v. United States*, 495 U.S. 575 (1990), compels us to examine other authorities (including surveying the laws of all 50 states) to determine the generic contemporary definition of manslaughter. I respectfully disagree. I think all that is necessary for us to determine is what the drafters of the Guidelines meant when they used the word "manslaughter" in § 2L1.2.

The *Taylor* case is distinguishable from this case in two respects. First, *Taylor* involved a federal criminal statute, not the Guidelines. Secondly, *Taylor* involved determining the meaning of the word "burglary" as used in the federal criminal statute, not the word "manslaughter" as used in the Guidelines. In *Taylor* the petitioner's sentence had been enhanced because of a previous conviction for burglary. *Taylor*, 495 U.S. at 579. The petitioner argued that burglary as used in the federal enhancement statute should be interpreted according to the common law. *Id.* at 596.

Since the common law was developed, the word "burglary" has undergone a much greater transformation in meaning than has the word "manslaughter." "Burglary" was defined by the common law to be "the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." *Id.* at 582 n.3. The common and generic meaning of "burglary" today

is the unlawful entry of any building, whether dwelling or business, whether in the nighttime or daytime. *Id*. at 598. Some states have labeled criminal statutes involving illegal entry to automobiles, boats, booths, tents, vessels, railroad cars, and vending machines as burglary, offenses that traditionally were never considered as the crime of burglary. *Id.* at 599. Consequently the definition of burglary has undergone a tremendous transformation. At common law manslaughter was defined as the unlawful killing of a human being without malice aforethought. *Black's Law Dictionary* still defines manslaughter as "[t]he unlawful killing of a human being without malice aforethought." BLACK'S LAW DICTIONARY 976 (7th ed. 1999).

Over the years manslaughter was divided into involuntary and voluntary manslaughter. Generally, involuntary manslaughter has covered cases where death was not intended or foreseen, and voluntary manslaughter has included all other homicides except those that constitute murder.

I perceive the correct solution is to determine what the writers of the Guidelines understood the word "manslaughter" to mean. This was the approach taken by this court in *United States v. Fry*, 51 F.3d 543 (5th Cir. 1995). Focusing on the intent of the Guidelines' drafters, the court wrote that "the drafters of the guidelines clearly indicated that manslaughter was to be considered a 'crime of violence.' Since the commentary to section 4B1.2 makes no distinction between voluntary and involuntary manslaughter, we hold that both are included." *Id.* at 546. Accordingly, it is not the court's responsibility to determine the generic meaning of manslaughter but to determine what the authors of the Guidelines intended.

Reading other sections of Sentencing Guidelines that deal with manslaughter makes it clear to me that the writers of the Guidelines understood involuntary manslaughter to include both

18

criminally negligent and reckless conduct. Guidelines § 2A1.3 provides the base offense levels for

voluntary manslaughter. Guidelines § 2A1.4 provides:

> **Involuntary Manslaughter**
> (a)    Base Offense Level:
>      (1)    **10**, if the conduct was criminally negligent; or
>      (2)    **14**, if the conduct was reckless.

U.S.S.G.§ 2A1.4 (2002).

When the Guidelines writers included the crime of manslaughter as an enumerated crime in

Guidelines § 2L1.2 subpart II, it did not differentiate between involuntary manslaughter and voluntary

manslaughter. As noted, the Fifth Circuit in *Fry* concluded that "manslaughter" includes both

"voluntary" and "involuntary manslaughter." In fact, the parties agree that the term "manslaughter"

includes both "voluntary" and "involuntary manslaughter." If the Guidelines writers had intended for

manslaughter to be limited, they could easily have inserted the word "voluntary" in front of the word

"manslaughter" or inserted a parenthetical, " involuntary manslaughter not included." Instead, they

drew no distinctions. I see no reason for this Court to impose distinctions that the drafters did not.


The Guidelines clearly delineate involuntary manslaughter as including negligent homicide.

Since "manslaughter" includes both "voluntary" and "involuntary manslaughter," and since

"involuntary manslaughter" is recognized by the Guidelines as including "negligent homicide," our

inquiry should proceed no further.

The Sentencing Guidelines were intended to make sentencing easier and simpler, not more

complicated and difficult. I know of no other court that has gone to the extent to survey the statutory

laws of all 50 states in order to arrive at a consensus definition in a Guidelines case. Because I

conclude that neither *Taylor* nor the Guidelines require such a survey, and because I think the Guidelines themselves disclose the meaning intended by the Guidelines' writers, I would affirm the sentence.  Accordingly, I respectfully dissent.